# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

UNITED STATES OF AMERICA,
    v.

JARED DYLAN SPARKS
Defendant

Criminal No. 3:16-CR-198 (AWT)

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO COMPEL PRODUCTION OF THE PROSECUTION TEAM'S NOTES, REPORTS, AND INFORMATION BASED ON *BRADY*, *GIGLIO* AND DISCOVERY VIOLATIONS

## AND

## MOTION FOR RECONSIDERATION OF THE COURT'S ORDER FOR AN EVIDENTIARY HEARING

COMES NOW the United States of America, by and through the undersigned attorneys, and hereby responds in opposition to defendant Jared Dylan Sparks's Motion to Compel Production of the Prosecution Team's Notes, Reports, and Information Based on *Brady*, *Giglio* and Discovery Violations (Dkt. No. 369).[1]  The Government submits that it has fully complied with its discovery obligations under Rule 16, *Brady*, *Giglio* and *Jencks* as well as this Court's Standing Order on Discovery; therefore, no further disclosures are warranted.  Further, the Government submits that the defendant, having failed to establish even a *prima facie* discovery violation, or formulate a claim for specific *Brady* information, is not entitled to an *in camera* inspection, much less an unbounded evidentiary hearing.

---

[1] The motion was also subscribed by defendant Jay Williams; however, given that Williams was acquitted at trial on all counts against him, and that he, therefore, cannot show that any allegedly undisclosed information would have changed the outcome of the case to his benefit, he no longer has an interest in this matter.  *See* Dkt. No. 377.  Accordingly, even if the Court proceeds with an evidentiary hearing, Williams is no longer a party.

## I.        Introduction

In the case at bar the Government disclosed over 50,000 pages in discovery.  On December 19, 2016, in its first discovery production, the Government disclosed, among other material, all existing reports of investigation, together with the full productions from Dropbox, Google, Yahoo! and Apple, as well as the corresponding search warrants and supporting affidavit.  In addition, the Government disclosed all information received from LBI Inc. ("LBI"), the victim-owner, which included the depositions of LBI President Peter Legnos; Charles River Analytics ("CRA") officials Karen Harper and John Houston; LBI Computer Forensic Examiner Daniel Dvorak; and the defendants Dylan Sparks and Jay Williams; as well as the LBI proprietary files recovered from Sparks's personal electronic devices by the StoneTurn Group.  Moreover, also in its first discovery production, the Government disclosed all existing Defense Computer  Forensic Laboratory ("DCFL") reports, informing the defendant about the expert testimony the Government would rely upon at trial.

The search of Sparks's Dropbox account, the forensic examination of his LBI computer and the search of his gmail account were the central components of the Government's case-in-chief.  The defendant was provided with all of that information on December 19, 2016. Therefore, any allegation of trial by ambush, as defense counsel has repeatedly advanced through the media in violation of Local Rule 57(h), is nothing but an attempt to create false rhetoric that is simply not supported by the facts of this case.[2]

---

[2] Rule 57(h) provides in pertinent part:  **Statements Prohibited Prior to Sentencing**

"After the completion of a trial … and prior to the imposition of sentence, a lawyer or law firm associated with the prosecution or defense shall not make or participate in making an extrajudicial statement that a reasonable person would expect to be disseminated by public communication and that is reasonably likely to affect the imposition of sentence."  On July 12, 2018, the Hartford Courant reported that defense attorney Patricia DeJuneas stated: "There is a clear pattern of the government trying to interfere with our ability to prepare for trial;" "It was very obvious the government was calling witnesses for whom we had

The Government was consistently cognizant of its discovery obligations and made appropriate *Brady*, *Gigglio* and *Jencks* disclosures during the course of trial, including disclosures related to defense witness Charles Lohrs, and Government witnesses David Mittelman, Richard Buser, Kevin Spark, Alex Zaferiou and Sue Paolini.  Thus, there have been no discovery violations of any kind.  Instead, the Government has produced thousands of pages in discovery containing information relevant to each one of its witnesses.  During its preparation for trial, when the Government learned of new potentially exculpatory information it disclosed that information to the defense.  However, confronted with overwhelming evidence of his guilt, the defense resorted to bold and unfounded allegations of discovery violations.

On June 25, 2018, the defendant filed a Motion for Disclosure of *Brady* and *Jencks* Material (Dkt. No. 340), based solely on responses by Special Agent Chris Mehring to questions posed during cross-examination confirming that the Government conducted trial preparation interviews of witnesses in this case.  From this fact alone the defendant made a ***quantum leap*** and alleged that "[i]f the Government is indeed spending multiple hours re-interviewing and preparing witnesses for trial testimony, there is undoubtedly *Brady* and *Jencks* material that is being generated and - -  if so - -  it should be produced to the defense."  But as stated above, and as detailed in the "Factual Background" below, appropriate *Brady*, *Gigglio* and *Jencks* disclosures were in fact made when appropriate.

Now in its Motion to Compel Disclosure of the Prosecution Team's Notes and Reports the defendant attempts to substantiate its previous speculative allegations.  But that motion

---

no idea how they were going to testify," calling it "trial by ambush."  On July 11, 2018, the CT Law Tribune reported:  In addition to allegations the government misled the court at closing, DeJuneas claims prosecutors surprised her team by "putting on witnesses for who we had no interview reports and no idea on what they were going to say."

makes plain that the defendant relies on nothing more than general allegations that the Government failed to disclose reports and handwritten notes – reports and notes it had no obligation to disclose – or argues the Government failed to disclose information that was neither *Brady*, *Giglio* or *Jencks* material.  These meritless contentions do not change the law or the facts. As will be demonstrated below, it is well-established that the Government's decision not to disclose information it has no obligation to disclose cannot trigger either an *in camera* inspection or hearing, much less support a request for unlimited disclosure of government privileged work product information.

## II.    Procedural Background

On November 3, 2016, defendant Dylan Sparks was charged by a Grand Jury in a 29-Count Indictment alleging conspiracy, theft of trade secrets, uploading and transmission of trade secrets and possession of stolen trade secrets belonging to LBI without authorization, in violation of 18 U.S.C. § 1832(a)(1), (2), (3) and (5). Dkt. No. 1.

The defendant was arrested on November 8, 2016, in the Western District of Oklahoma. Sparks made his initial appearance in the District of Connecticut on December 8, 2016, and was arraigned on that same date.  Dkt. No. 29.  Sparks was released on bond.

The Court signed the Discovery Protective Order on December 19, 2016.  Dkt. No. 40. The Government made its first discovery production on that same date.  *See* Copy of Discovery Letter dated December 19, 2016, attached hereto as Exhibit A.

## III.   Factual Background

### A.  First Disclosure of the Government's Theory of the Case – The Indictment

The 20-page Indictment returned in this case outlines the entities and individuals involved in the offenses charged; it describes the contracts and technologies involved; it lists the

security protections LBI is alleged to have taken to protect its trade secret information; it describes the programs used to generate some of the trade secrets charged; and it describes the defendant's alleged involvement with the technologies.  Further, in Count One, which charges Conspiracy, the Indictment lists 20 overt acts carried out in furtherance of the conspiracy, thus fully describing the Government's theory of criminal liability.  Last, in Counts Two through Twenty-Nine, the Indictment clearly identifies the trade secrets that are alleged to have been stolen, or uploaded, transmitted or possessed without authorization.

Sparks was provided with a copy of the Indictment at his initial appearance in the Western District of Oklahoma on November 8, 2016.  Therefore, as of that date, Sparks was aware of the Government's theory of criminal liability.

B.  First Discovery Production, December 19, 2016

The Government's first discovery production was comprised of 15,167 pages.  It included all investigative reports that had been generated to date.  *See* Chart of Investigative Reports Produced in Discovery on December 19, 2016, attached hereto as Exhibit B.  Among the investigative reports produced were reports related to interviews of Government trial witnesses Peter Legnos (17 reports); David Mittelman, (2 reports); Francine Brodeur (2 reports)[3]; Pablo Clemente Colon (1 report); and Sue Paolini (1 report).  In addition, the Government produced copies of all depositions it had in its possession to date, including two depositions of Peter Legnos and one deposition of Dan Dvorak, taken during the course of the civil trade secret case between the victim-owner here and the defendant, *LBI Incorporated v. Jared Dylan Sparks, et als*, Civil No. KNL cv12-6018984-s.

---

[3] The Government obtained Francine Brodeur's deposition closer to trial and produced the same in discovery on May 25, 2018.

Moreover, the Government produced reports of interview of defense witness Dan Deitz; as well as the depositions of the defendants, Sparks and Williams, and the depositions of CRA officials Karen Harper and John Houston.  Furthermore, the Government also produced several interview reports of another six individuals, including ex-LBI employees Courtney Murphy and Nick Vasallo, none of whom testified at trial.

In this first discovery production, the Government also disclosed the full productions received from Dropbox, Apple, Yahoo! and Google pursuant to search warrants executed by the Government as well as copies of the search warrants and supporting affidavit.  In addition, the Government produced all information received from LBI, through grand jury subpoenas, which included discovery that had been generated as part of the civil case.  This information included all files produced by the StoneTurn Group.  The Government also produced non-grand jury information received from LBI.

In addition, the Government produced the reports that had been received from the DCFL to date, together with the underlying notes.  These initial reports dated October 22, 2012 and August 13, 2014, established, among other things, that the Dylan2 profile used by Sparks created the Dropbox folder found in the LBI computer.

C.  Discovery Letter dated February 21, 2017

On February 21, 2017, the Government produced in discovery an additional DCFL report by Computer Forensic Examiner Alexander Zaferiou, who testified at trial, confirming the findings included in the previous DCFL reports, and indicating that the Dylan2 profile uninstalled the Dropbox application on November 7, 2011.  *See* Discovery Letter dated February 21, 2017, attached hereto as Exhibit C.  The Government made this disclosure despite the fact

that no scheduling order had yet been entered.[4]  On October 23, 2017, the Government provided Sparks with a copy of the mirror image of the LBI computer used by him, thereby enabling Sparks to conduct its own forensic examination of his LBI computer.  Two additional DCFL reports were provided on December 12, 2017, and February 1, 2018.[5]

D.  Discovery Disclosures Made During Trial

During the course of trial the Government continued to adhere closely to its discovery obligations pursuant to *Brady*, G*iglio* and *Jencks* as well as Rule 16 and its local counterpart.

1.  Disclosure Related to Chuck Lohrs

In preparation for trial the Government interviewed ex-LBI employee Charles Lohrs, who testified for the defense during trial. During the course of the interview, Lohrs made statements that could have been viewed as favorable to defendant Jay Williams regarding his possible involvement with the hole drilled into one of the RHIBs refurbished by LBI, prior to the December 2011 demonstration; therefore, a copy of the FBI 302 report was produced to the defense on June 6, 2018.[6]  *See* Copy of FBI 302 Report of Interview of Charles Lohrs attached hereto as Exhibit E.

2.  Disclosure regarding Attorney-Client Emails

As the Court is aware, given the magnitude of the discovery in this case, the defense

---

[4] A Scheduling Order was entered on March 27, 2017, scheduling trial for February 2018 and setting the Government deadline for expert disclosures for December 16, 2017.  Dkt. No. 63.  That Scheduling Order was amended on February 27, 2018, to continue the trial date to June 6, 2018.  Dkt. No. 157.  The deadline for defense expert disclosures was continued by agreement of the parties to May 1, 2018; and later by Court Order to May 15, 2018.  Dkt. No. 191.

[5] Additional discovery letters were provided.  *See* Chart of Discovery Letter attached hereto as Exhibit D.

[6] Defendant Jay Williams filed a motion to exclude evidence regarding any allegation of tampering with the RHIBs.  *See* Dkt. No. 235.

requested and the Government agreed, to provide the path to the location of each Government

exhibit in its discovery production.  On June 7, 2018, Government Paralegal Iris Carlson, while

ascertaining the path of email communications in discovery to include in the Government's

Exhibit List, inadvertently saw two email communications dated June 27, 2012, between the

defendant and his attorney Patty DeJuneas.  Ms. Carlson immediately stopped her review and

alerted AUSA Jacabed Rodriguez-Coss.  AUSA Rodriguez-Coss immediately took steps to

insure that the privileged emails were deleted from the Government's production.  DCIS

supervisor Jessica Herrington was alerted and designated as taint agent to review the copy of the

production that DCIS had in its possession and the case agent was instructed not to access the

production until such time as the taint agent had completed her review and ensured that no client-

attorney communications were included in the production.  Moreover, defense counsel was

informed of the issue on that same date.  *See* Copy of Letter to Counsel Patty DeJuneas dated

June 7, 2018 attached hereto as Exhibit F.[7]

> 3.  Disclosure Related to Kevin Spark

On June 19, 2018, Kevin Spark, attorney for Dropbox, arrived in Connecticut to

testify at trial as Dropbox's designated witness.  After his arrival, Mr. Spark informed the

Government that the transaction identification number contained on the email communication

from Dropbox to defendant Sparks, dated November 7, 2011, confirming the storage upgrade to

his account, was associated with a different Dropbox account, but that he had no information

about the other account.  SA Chris Mehring summarized the information provided in a report

---

[7] It was later determined that the attorney-client emails found by Paralegal Iris Carlson originated, not from the Google production produced in discovery by the Government (which had been previously reviewed for any such information), but rather from an LBI production of records related to discovery from the civil case.  The discovery in the civil case was produced by CRA to LBI.

dated June 20, 2018, which was produced to the defense on that same date in court.  *See* Copy of

Report of SA Chris Mehring dated June 20, 2018, attached hereto as Exhibit G.

      4.   <u>Disclosure Related to Richard Buser</u>

In the evening of June 24, 2018, during the course of a trial preparation session,

Government witness Richard Buser made statements regarding Government Trial Exhibit 121,

which the Government thought could be viewed as favorable to the defense.  FBI Agent Greg

Stroh, who was present during the session, drafted an FBI 302 report summarizing the

statements.  *See* Copy of FBI 302 report by SA Greg Stroh attached hereto as Exhibit H.  Copy

of SA Stroh's report was hand-delivered to counsel in court the next day, on June 25, 2018.

      5.   <u>*Jencks* Disclosure for Richard Buser</u>

On June 27, 2018, Richard Buser, without being asked to do so, drew a lay-out of the LBI

office space on a dry-erase whiteboard located within the U.S. Attorney's Office.  A photograph

of the drawing was taken and disclosed to the defense on that same date.  *See* Government Trial

Exhibit 507.

      6.   <u>Disclosures Related to David Mittelman</u>

On June 18, 2018, during the course of a trial preparation session Government witness

David Mittelman discovered that he still had an LBI file on his LBI folder within his personal

Dropbox Account.  SA Chris Mehring summarized the information in a report that was produced

to the defense in court the next day on June 19, 2018.  *See* Copy of Report of SA Chris Mehring

dated June 18, 2018, attached hereto as Exhibit I.  This information led the Government to seek

consent from Mr. Mittelman to obtain his Dropbox logs, which he provided.  On June 19, 2018,

Dropbox produced Mr. Mittelman's logs from November 11, 2011 to August 31, 2013.  The

production was password protected.  The Government gained access to the production at

approximately 6:00 pm, in the evening of June 19, 2018.  After reviewing the records, the

Government promptly disclosed the records to the defense the next day, June 20, 2018.  *See*

Copy of Email Communication dated June 20, 2018, attached hereto as Exhibit J.

On June 20, 2018, the Government again met with Mr. Mittelman, and based on the

Dropbox production asked him to search his personal Dropbox account for any LBI files.  The

responsive information was summarized in a report by SA Mehring, which was disclosed to the

defense in court on June 21, 2018.  *See* Copy of Report of SA Chris Mehring dated June 21,

2018, attached hereto as Exhibit K.

> 7.  *Jencks* Disclosure for David Mittelman

On June 20, 2018, the Government received 20 email communications between David

Mittelman and his previous LBI supervisor, Matt Jewel, related to work that Mittelman

performed for LBI remotely from home in 2012 and 2013.  All 20 email communications were

produced to the defense in discovery.  *See* Email Communication dated June 20, 2018, attached

hereto as Exhibit L.  Five of these email communications were introduced into evidence at trial.

*See* Government Trial Exhibits 441, 443, 444, 445 and 446.

> 8.  *Jencks* Production for Sarah Healey

On June 28, 2018, the Government produced material that constituted *Jencks* information

regarding the anticipated testimony of Sarah Healey.  *See* Copy of Email Communication dated

June 28, 2018, attached hereto as Exhibit M.  Ms. Healey was expected to testify about the

"redwell files" that were produced by Sparks during the course of his deposition in the civil case.

The Court later excluded Ms. Healey's testimony.

> 9.  *Jencks* Production for Sue Paolini

At various times during trial prep sessions Government witness Sue Paolini created

notes regarding the subject she was asked about. Those notes were produced in discovery on June 25, 2018, prior to her testimony.  *See* Copy of Email Communication dated June 25, 2018, attached hereto as Exhibit N.

          10. *Jencks* Production for Computer Forensic Examiner Alex Zaferiou

Also on June 25, 2018, the Government produced in discovery a text message from Computer Forensic Examiner Alex Zaferiou, containing substantive information about which he was expected to testify.  *See* Exhibit N.

**IV.**    **Applicable Legal Framework**

    A.  Rule 16 and the District of Connecticut Standing Order on Discovery

Rule 16(a)(1) of the Federal Rules of Criminal Procedure enumerates the disclosures to be made by the Government in a criminal case.  It provides for the disclosure of statements by the defendant and his criminal record.  Rule 16(a)(1)(A), (B), (C) and (D).  In addition, Rule 16 provides that the Government must permit the defendant to inspect and copy any items that are material to preparing the defense; will be used in the Government's case-in-chief or were obtained from the defendant.  Rule 16(a)(1)(E).  Further, the Government must disclose reports or examinations and tests if the evidence is material to preparing a defense or the Government intends to use the evidence in its case-in-chief.  Rule 16(a)(1)(F).  Last, Rule 16 mandates that the Government disclose expert witnesses.  Rule 16(a)(1)(G).

Rule 16(a)(2) specifically sets forth information that is **not subject to disclosure**.  It provides that, except as permitted by Rule 16(a)(1) (A)-(D), (F) and (G), the rule does not authorize "the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case.  Nor does this rule authorize the discovery or

inspection of statements made by prospective government witnesses except as provided in 18 U.S.C. § 3500." The 1966 Advisory Committee Notes for that subsection cites *Palermo v. United States*, 360 U.S. 343 (1959), which recognized the "strong[] fear[] that disclosure of memoranda containing the investigative agent's interpretations and impressions might reveal the inner workings of the investigative process, and thereby injure the national interest." *Id*. at 350.

The Standing Order on Discovery for the District of Connecticut mirrors Rule 16(a)(1) and (a)(2).

Therefore, unless interview reports contain statements by the defendant or *Brady* or *Giglio* information, they are not subject to disclosure. *See United States v. Armstrong*, 517 U.S. 456, 462-63 (1996) ("Under Rule 16(a)(1)(C), a defendant may examine documents material to his defense, but, *under Rule 16(a)(2), he may not examine Government work product in connection with his case*.") (emphasis added); *United States v. Koskerides*, 877 F.2d 1129, 1133-34 (2d Cir. 1989).

B. <u>*Brady v. Maryland*</u>

"[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). Therefore, under *Brady*, "the Government has a constitutional duty to disclose favorable evidence to the accused where such evidence is 'material' either to guilt or to punishment." *United States v. Coppa*, 267 F.3d 132, 139 (2d Cir. 2001). Evidence is favorable to the accused if it either "tends to show that the accused is not guilty" or "impeaches a government witness." *United States v. Gil*, 297 F.3d 93, 101 (2d Cir.2002); *Coppa*, 267 F.3d a 139 ("Favorable evidence includes not only evidence that tends to exculpate the accused, but also evidence that is useful to impeach the

credibility of a government witness.").  "[E]vidence is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," such that the failure to disclose " 'undermine[s] confidence in the verdict.' "  *Cone v. Bell,* 556 U.S. 449, 469–70 (2009) (*quoting Kyles v. Whitley,* 514 U.S. 419, 435 (1995)).

Notwithstanding, the Supreme Court has "never held that the Constitution demands an open file policy," *Kyles,* 514 U.S. at 437, as "[a]n interpretation of Brady to create a broad, constitutionally required right of discovery would entirely alter the character and balance of our present systems of criminal justice .... Furthermore, a rule that the prosecutor commits error by any failure to disclose evidence favorable to the accused, no matter how insignificant, would impose an impossible burden on the prosecutor and would undermine the interest in the finality of judgments." *United States v. Bagley,* 473 U.S. 667, 675 (1985).

Thus, to establish a *Brady* violation, a defendant must show (1) that the evidence at issue is favorable to the accused, either because it is exculpatory or because it is impeaching; (2) that the evidence was suppressed by the Government; and (3) that he was prejudiced.  *United States v. Paulino*, 445 F.3d 211, 224 (2d Cir. 2006); *United States v. Jackson,* 345 F.3d 59, 71 (2d Cir. 2003) (*quoting Strickler v. Greene,* 527 U.S. 263, 281–82 (1999)).

Regarding suppression, "[a]s this [C]ourt has frequently recognized, evidence is not considered to have been suppressed within the meaning of the Brady doctrine if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of that evidence." *Paulino, 445 F.3d* at 225 (internal quotation marks and modifications omitted); *United States v. Gonzalez,* 110 F.3d 936, 944 (2d Cir.1997); *Jackson,* 345 F.3d at 73.

Regarding prejudice, "even when the government fails to disclose favorable information to the defense, a *Brady* violation still requires a reasonable probability that a different verdict would have resulted from disclosure of the information that the defendant claims was suppressed." *United States v. Cacace*, 796 F.3d 176, 184 (2d Cir. 2015) (*per curiam*) (internal quotation marks omitted).  "For example, where the undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." *United States v. Avellino*, 136 F.3d 249, 257 (2d Cir. 1998).

"Although the government's obligations under *Brady* may be thought of as a constitutional duty arising before or during the trial of a defendant, the scope of the government's constitutional duty ... is ultimately defined retrospectively, by reference to the likely effect that the suppression of particular evidence had on the outcome of the trial." *Coppa,* 267 F.3d at 140.  As a result, "strictly speaking, there is never a real *'Brady* violation' unless the [Government's] nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict." *Strickler,* 527 U.S. at 281, 119 S.Ct. 1936.  This aspect of *Brady* affects not only what the Government is obligated to disclose, but when it is required to do so. "[T]he timing of a disclosure required by *Brady* is ... dependent upon the anticipated remedy for a violation of the obligation to disclose: the prosecutor must disclose ... exculpatory and impeachment information no later than the point at which a reasonable probability will exist that the outcome would have been different if an earlier disclosure had been made." *Coppa,* 267 F.3d at 142.

The obligation to disclose *Brady* information is on the Government and its representation that it has complied with its duty is generally accepted. *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987); *United States v. Agurs*, 427 U.S. 97, 103 (1976). "[D]istrict courts in this circuit routinely accept [this] type of representation that the Government has made concerning *Brady* [and *Giglio* ] material." *United States v. Savarese,* 2002 WL 265153, at *2 (S.D.N.Y. Feb. 22, 2002); *accord United States v. Upton,* 856 F.Supp. 727, 746 (E.D.N.Y.1994) ("To the extent that the government represents that it 'has produced every document in its possession which relates in any way to this case,' ... the court must assume the veracity of that representation."). Therefore, a defendant's request for such information must amount to more than "mere speculation" that the Government has not provided everything that it is obligated to disclose. *See United States v. Calhelha*, 456 F.Supp.2d 350, 369 (D.Conn. 2006).

In the rare circumstance where a substantiated allegation is raised that a government file contains *Brady* and/or *Giglio* information, the proper procedure is for the Court to conduct an *in camera* inspection to determine whether any disclosures are necessary. For example, in *Ritchie, supra*, the defendant was charged with the rape, involuntary sexual intercourse, incest and corruption of a minor in connection with his daughter. 480 U.S. at 43. The defendant, through a subpoena, sought disclosure of the Pennsylvania Children and Youth Services ("CYS") file, which contained a file related to the charges against him and a report on a previous allegation of abuse related to his daughter. *Id*. CYS refused to comply claiming that the records were privileged. *Id*. The defendant argued that he was entitled to disclosure because the file may contain the names of favorable witnesses and other exculpatory evidence. *Id*. at 44. The prosecution in *Ritchie* did not inspect the CYS file, and the trial judge, though he did not inspect the entire file, refused to order disclosure. *Id*.

The Pennsylvania Supreme Court held that Ritchie, through his lawyer, had the right to examine the full contents of the CYS records.  *Id*. at 50.  While the Supreme Court agreed that Ritchie was entitled to have the CYS file reviewed for potential *Brady* information, it held that such review should be conducted by the trial court, not defense counsel.  *Id*. at 58.  The Court specifically stated that "a defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files."  *Id*. at 59 (*citing United States v. Bagley*, 473 U.S. 667, 675 (1985) and *United States v. Agurs*, 427 U.S. 97, 111 (1976)).  "Settled practice is to the contrary" *Id*. at 59.

> In the typical case where a defendant makes only a general request for exculpatory material under *Brady v. Maryland*, [citation omitted] it is the State that decides which information must be disclosed.  Unless defense counsel becomes aware that other exculpatory evidence was withheld and brings it to the court's attention, the prosecutor's decision on disclosure is final.  Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance.  *See Weatherford, v. Bursey*, 429 U.S. 545, 559, 97 S.Ct. 837,  846 51 L.Ed.2d 30 (1977) ("There is no general constitutional right to discovery in a criminal case, and *Brady* did not create one").

*Id*. at 59-60.  The Ritchie Court found that allowing the defense full disclosure would deny the Commonwealth's compelling interest in protecting child-abuse information.  *Id*.  at 60.  The Court in *Ritchie* thus remanded to afford the trial court an opportunity to review the CYS file to determine whether it contained any exculpatory information that could have changed the outcome of the trial, or whether there was no such information.

This Court followed *Ritchie* in *Bruno v. Connecticut Commissioner of Correction*, 2006 WL 2839232 in denying a *Brady* claim.  In *Bruno*, the petitioner, who had been convicted of murder, sought habeas relief based on the trial court's denial of *in camera* review of psychiatric and school records of two Government witness.  *Id*. at p. 8.  Petitioner claimed the records pertained to the witnesses' ability to perceive, recall and relate events.  The *Bruno* court found

that the petitioner had failed to show that the records contained material information given other

available information available to him at trial.  *Id*. at p. 9.

> It may be the records contained some useful information in general, but petitioner
> failed to show that they were material on the issue of Bingham's testimonial capacity.
> Moreover, petitioner was free to ask Bingham on cross-examination about his alcohol
> consumption on that night and in general.

*Id*.

Similarly, in *Betances v. Hinkle*, 2006 WL 2474959 (D.Conn. 2006), this Court denied

relief to a habeas petitioner who claimed that the trial court erred in denying *in camera*

inspection of the personnel file of the arresting officer for lack of specificity.  *Id*. at p. 5.

> To obtain in camera review of confidential information, a criminal defendant must
> "first establish[] a basis for his claim that it contains material evidence."

*Id*. at p. 5 (*quoting Ritchie*, 480 U.S. at 58 n. 15).

In *United States v. Kiszawski*, 877 F.2d 210 (2d Cir. 1989) the defense requested any

potential impeachment information regarding Government witnesses.  When no disclosure was

made, the defendant served a subpoena upon the FBI for the complete personnel files of two

testifying agents.  *Id*. at 215.  The Government informed that there was no *Brady* information in

the file of one agent, but disclosed the existence of complaints in the file of a second agent.  *Id*.

The Government further informed that the FBI exonerated the agent on one complaint and

deemed the others unfounded.  *Id*.  The Court refused to conduct an *in camera* inspection of the

files.  *Id*.  The Second Circuit concluded that the proper procedure would have been for the Court

to conduct an *in camera* inspection of the file.  *Id*. at 216.  It remanded to allow the district court

to conduct an *in camera* examination of the file to determine whether information in the file

should have been disclosed and, if so, whether the defendant was entitled to a new trial or

whether nondisclosure was harmless beyond a reasonable doubt.  *Id*.

Similarly, in *United States v. Leung*, 40 F.3d 577 (2d Cir. 1994), the Second Circuit affirmed the district court's action in conducting an *in camera* inspection of a *Jencks* file for a Government witness, and its disclosure of a single document to the defendant.

> **In the rare circumstance where such inspection** is required, its purpose is not to provide a general discovery device for the defense; **criminal defendants have no constitutional right to know the contents of Government files in order to present argument in favor of disclosure**. *See Pennsylvania v. Ritchie*, 480 U.S. at 59-60, 107 S.Ct. at 1002-03. Rather, the purpose of in camera inspection is to supplement the Government's assessment of materiality with the impartial view provided by the trial judge. *See* Kiszewski, 877 F.2d at 215-16.

40 F.3d at 583 (emphasis added). The Second Circuit went on to find that the defendant's unsupported speculation that the file might include other material evidence was an inadequate basis for questioning the district court's materiality determination. *Id*.

C. The Jencks Act

The Jencks Act, 18 U.S.C. § 3500, provides that:

> After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

The term "statement" is defined as: (1) a written statement made by said witness and signed or otherwise adopted or approved by him; (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or (3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury. 18 U.S.C. § 3500(e).

Section 3500 limits production to the time period *after* a covered witness testifies ("In any criminal prosecution brought by the United States, no statement or report in the possession

of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpoena, discovery, or inspection until said witness has testified on direct examination in the trial of the case."); *accord United States v. Percevault,* 490 F.2d 126, 132 (2d Cir.1974) (holding that "the government cannot be compelled to disclose statements of prospective witnesses prior to the time prescribed by the Jencks Act").

In the instant case, however, the Court's Scheduling Order provided for the early disclosure of *Jencks* material. Therefore, the Government disclosed *Jencks* material on June 4, 2018.[8]

Notes and/or reports may be considered "substantially verbatim recital[s]" of a witness's statement if they "could fairly be deemed to reflect fully and without distortion what had been said to the government agent," and are thus competent impeachment evidence for trial. *Palermo v. United States,* 360 U.S. 343, 352 (1959).  This standard "was designed to eliminate the danger of distortion and misrepresentation inherent in a report *which merely selects portions, albeit accurately, from a lengthy oral recital. Quoting out of context is one of the most frequent and powerful modes of misquotation.* We think it consistent with this legislative history, and with the generally restrictive terms of the statutory provision, to require that summaries of an oral statement which evidence substantial selection of material, or which were prepared after the interview without the aid of complete notes, and hence rest on the memory of the agent, are not to be produced.  Neither, of course, are statements which contain the agent's interpretations or impressions." *Id.* (emphasis added).

---

[8] The Government's initial *Jencks* disclosure was inadvertently incomplete due to an error in the transfer of electronic files.  However, as soon as the Government learned of the error, it immediately made the full disclosure on June 8, 2018.  *See* Email Communication dated June 8, 2018, attached hereto as Exhibit BB.

Accordingly, a "third party's characterization of a witness's statement does not constitute a prior statement of that witness unless the witness has subscribed to that characterization." *United States v. Almonte,* 956 F.2d 27, 29 (2d Cir.1992) (internal quotation omitted).  And thus, a defendant is not entitled to summaries of a witness's statement, "fragmentary notes, jottings, scraps or writings which are not 'substantially verbatim,' " "rough, choppy, disjointed, scattered jottings full of sentence fragments," or "shorthand, sketchy notes" that are "bare-bones summary of the witness's remarks." *See United States v. Allen,* 798 F.2d 985, 994 (7th Cir. 1986); *United States v. Thomas,* 282 F.2d 191, 194 (2d Cir. 1960); *United States v. Sainato,* 29 F.Supp.2d 116, 118 (E.D.N.Y. 1998); *United States v. Viola,*1992 WL 333650, at *1 (E.D.N.Y. 1992).[9]

Nor does the fact that the Government may have elected to produce in discovery what is essentially privileged work product create a right in favor of the defendant for production of all such information.  As stated above, Fed.R.Crim.P. 16(a)(2) exempts from disclosure "reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."

---

[9] *See also United States v. Ramos,* 27 F.3d 65, 69–70 (3d Cir.1994) (officer's rough notes of interview with cooperating co-conspirators not Jencks Act statements because not substantially verbatim recitals); *United States v. Hall,* 93 F.3d 126, 130 (4th Cir.1996) (defendant not entitled to government's notes from interview with witness because witness had never seen documents and agents never asserted that notes were either verbatim statements or approved by witness), *cert. denied,* 519 U.S. 1151 (1997); *United States v. Williams,* 998 F.2d 258, 269 (5th Cir.1993) (FBI 302 Forms, containing summaries of interviews with government witness, not Jencks Act material because did not contain verbatim statements by witness, only "scattered jottings" made by FBI agents); *United States v. Phibbs,* 999 F.2d 1053, 1089 (6th Cir.1993) (pretrial interview notes not Jencks Act material because witness did not adopt notes as substantially verbatim statements given by him); *United States v. Delgado,* 56 F.3d 1357, 1364 (11th Cir.1995) (DEA agent's notes from debriefings of co-defendant not Jencks Act material because not verbatim transcripts), *cert. denied,* 516 U.S. 1049, 116 S.Ct. 713, 133 L.Ed.2d 667 (1996).

The Second Circuit recently addressed the issue of when handwritten notes taken by an investigative agent during the course of an interview become subject to discovery under the Jencks Act and Rule 16 in *United States v. Certified Environmental Services ("CES")*, 753 F.3d 72 (2d Cir. 2014).  CES references two circumstances under which handwritten notes by an investigative agent become discoverable.  First, it establishes that handwritten notes containing statements of a defendant are discoverable under Rule 16(a)(1)(B).  753 F.3d at 93.  Second, CES holds that when an investigative agent testifies about the statements a witness made to him during the course of an interview, the agent's interview notes can be viewed as a witness's prior "statement" relating to the subject matter of his testimony.  As such, the notes become discoverable under the Jencks Act.  *Id*. at 93-94.

As established above, handwritten notes would be otherwise discoverable as *Jencks* material when they constitute a *verbatim* statement of the witness or when the witness adopted the notes as his own statement.

D.  U.S. Attorney's Office Policy Quoted by the Defense

During trial, on June 27, 2018, following the direct testimony of Richard Buser, counsel for defendant Williams read an excerpt of an outdated U.S. Attorney's Office Policy to the Court, which stated:

> It is the policy of the Office that following any meeting with a witness, including, but not limited to, when preparing for grand jury, trial or any other hearing, the attending agent will be required to prepare a report of interview that memorializes any newly disclosed, inconsistent or exculpatory information obtained during such meeting.  Such information may need to be disclosed to the defense if the witness is to be called by the government as a witness at trial or if the information constitutes *Brady* or *Giglio* material as discussed in these policies. If a report will not be prepared in time to make a timely disclosure of the new information to enable the defense to utilize the information to prepare for trial, then Assistants need to provide the information to defense counsel by letter or email message.

*See* Excerpt of Trial Transcript, June 27, 2018, attached hereto as Exhibit CC.  The policy was meant to remind prosecutors of their obligation to disclose any *Brady* or *Giglio* information learned during a meeting with a prospective witness.  The policy did not require the disclosure of handwritten notes when a report of interview was not generated.  Rather, the policy required disclosure when new information was learned that was different or conflicted with prior known information, when information exculpatory to the defense within the meaning of *Brady* was learned or when the notes may constitute *Jencks* material.[10]

The language at Section G, subpart (4) of that policy makes clear that the policy did not require the disclosure of handwritten notes.

(4)    **It is the policy of this Office to ensure that Assistants preserve the notes they generate at a witness interview**.

When notes are generated at a witness interview by Assistants, Assistants should preserve their notes.  Federal agencies also have internal rules that require agents to preserve notes generated at witness interviews.  Note that it is **not** the policy of this Office to produce in discovery the rough notes of agents or Assistants taken during interviews **when** a report of FBI 302 is generated regarding the interview.  Be aware that a 2007 decision by Judge Droney indicates that the rough notes of an agent taken during the interview/proffer of a defendant are discoverable pursuant to Fed.R.Crim.P. 16, even if the notes have been reduced to a final report.  United States v. Ferguson, 478 F.Supp.2d 220, 235-38 (D.Conn. 2007).  An Assistant should review his or her own notes (if any), and ensure that an agent reviews his or her own notes, to determine whether the notes contain discoverable information that has not been disclosed in the final report.  If additional information needs to be disclosed after this review, the agent should generate a supplemental memorandum or report or the Assistant should provide the defense with a discovery letter.

In situations where no report or 302 is generated concerning a witness interview, a decision should be made on a case-by-case basis whether to produce agent notes in lieu of a report.  In any event, if the agent's notes are not produced in discovery, an Assistant

---

[10] Although that policy remains available on a Department of Justice web page collection of publicly released criminal discovery policies from each U.S. Attorney's Office, *see* Public USAO Criminal Discovery Policies, https://www.justice.gov/usao/resources/foia-library/public-usao-criminal-discovery-policies (last visited August 6, 2018), that page includes a disclaimer that "the[] policies were submitted in 2010 and may have since been updated."

should never hesitate to disclose discoverable information contained in the agent notes to the defense through a letter, e-mail or other form of written disclosure.

Note that it is not the policy of this Office to produce in discovery a copy of the typed or handwritten notes generated by an Assistant at a witness interview.  That being said, an Assistant should disclose discoverable information to the defense that the Assistant is aware of by requesting that an agent prepare a written report of the discoverable information or by sending a letter, email or other form of written disclosure to the defense.

(Underlined emphasis added).  Thus the policy quoted did not require the disclosure of notes, but rather the disclosure of any *Brady*, *Giglio* or *Jencks* information.  In any event, it is well-established that an internal policy of the Department of Justice does not create a right for a criminal defendant.  *See United States v.  Piervinanzi,* 23 F.3d 670 (2d Cir. 1994) (DOJ guidelines provide no substantive rights for defendants); *United States v. Ng*, 699 F.2d 63, 71 (2d Cir. 1983) ("To hold the policy legally enforceable would be to invite the Attorney General to scrap it, which would hardly be in the public interest."); *United States v. Ponce*, 2015 WL 4254058, p. 4 (same); *United States v. Feliciano*, 998 F.Supp. 166, 169 (D.Conn. 1998) (same).

## V.    Argument

In this case, the Government produced to the defense thousands of pages of witnesses' statements by way of reports of interviews and depositions.  Moreover, the Government produced all of the civil discovery it received via grand jury subpoenas from LBI, which included numerous email communications.  In addition, all documents received from LBI in response to Government requests were also disclosed in discovery.  Given the amount of discovery turned over in this case, it can hardly be said that Sparks was surprised by the testimony of any of the Government witnesses.  In fact, Sparks's defense counsel has been involved in this case since at least June 2012, far longer than any of the prosecutors.  She was consistently assisted at trial by CRA Attorney Josh Solomon; therefore, it is reasonable to infer

that defense counsel also had the benefit of any discovery produced by LBI to CRA.   Therefore, the allegation that Sparks was surprised by any of the Government's evidence at trial is not credible.

The defendant takes an expansive view of what information is subject to discovery under Rule 16, *Brady* and *Jencks*.  In the defendant's view, anything at all that might have been useful to the defense, in any way, is exculpatory and thus subject to disclosure.  But this is not the law. "The mere possibility that an item of undisclosed information might have helped the defense … does not establish 'materiality' in the constitutional sense" *Agurs*, 427 U.S. at 109-110.  Thus, the defendant's allegations should be considered within the appropriate legal framework set forth above.

The defendant alleges 11 different discovery violations by the Government that he claims justifies the extraordinary measure of ordering full disclosure of Government privileged work product files.  Such an order would be inappropriate given the facts of this case.  Indeed, when the allegations of the defendant are viewed in light of the discovery produced in this case and the applicable legal framework, it is clear that the Government did not withhold any discoverable information.

    A.  <u>The Government complied fully with its discovery obligations under Rule 16, *Brady* and *Giglio*</u>.

At no point during trial did Sparks make a *prima facie* showing that the Government violated *Brady or Giglio*.[11]  As the facts and the law discussed herein demonstrate, the

---

[11] The Government respectfully submits that when the Court stated that the defendant had made a *prima facie* showing of a discovery violation, it did not have all relevant information before it in that it was not aware of the extent and nature of the discovery provided in this case.

Government has fully complied with its discovery obligations.  The Government addresses each of the discovery violations alleged by Sparks below.

      1.   <u>The Government is Not Required to Generate or Produce Reports.</u>

Sparks claims that the Government violated its discovery obligations by not producing interview reports for Government witnesses Frank Herr, Gary Davis, Richard Buser, Allen Flick, Kevin Spark, Dan Dvorak and Sean Tuttle.[12]

Initially, interview reports are exempt from discovery by Rule 16(a)(2) and this Court's Standing Order on Discovery.  Neither Rule 16(a)(2) or the Standing Order authorize "the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case."  Both also specifically exempt from <u>disclosure or inspection</u> statements made by prospective government witnesses, except as mandated by the Jencks Act.  Therefore, the Government's decision not to produce an interview report in and of itself is not a discovery violation.

Second, as was repeatedly stated throughout the trial, the Government did not generate interview reports for the nine listed individuals, and the defendant points to no legal authority that states that the Government was under any obligation to generate an interview report. Instead, Sparks argues that the failure to produce interview reports for these nine individuals violates, not *Brady*, but the U.S. Attorney's Office's policy on discovery.

But as established above, an internal policy of the U.S. Attorney's Office does not create a right for the defendant.  Moreover, the rules and case law quoted above do not require that a

---

[12]  Sparks also complains that the Government did not generate a report for Sean Li (the Dropbox representative who responded to the Dropbox search warrant) and Matt Jewel (an ex-LBI employee), neither of whom testified at trial.  Because neither of these witnesses testified at trial, we do not address them herein.

report be prepared after every interview conducted.  Therefore, the Government did not violate any discovery obligation.

The Government further submits that while the Government did not generate an interview report for Mr. Buser, Mr. Flick, Mr. Herr, Mr. Davis, Mr. Tuttle, Mr. Dvorak and Mr. Spark, it did produce other information in discovery that fairly informed the defendant as to who these witnesses were, and what they would testify about.

**Mr. Buser**:     First, Richard Buser was a mechanical engineer employed by LBI immediately after graduating college and he worked for Mr. Legnos from the end of May 2010 until March 2011, that is, approximately 10 months.  Mr. Buser was called to testify by the Government primarily because he designed three of the five SolidWorks files charged in the Indictment, specifically the files charged in Count 4 (the Sphere); Count 5 (LVC Motor); and Count 7 (Pressure Vessel End Cap).  Mr. Buser, as did Peter Legnos, David Mittelman, Francine Brodeur, Charles Lohrs, Brian McNamara and Mark Spencer, identified a number of photographs of the physical facilities of LBI, and a number of employee documents, such as Non-Disclosure Agreements and Non-Compete Agreements.  Mr. Buser then described the process of creating the files that were charged in Counts 4, 5 and 7 and showed the files, which were already admitted in evidence, to the jury.  *See* Government Trial Exhibits 58 (Count 4, the Sphere); 59 (Count 5, the LVC Motor) and 61 (Count 7, the Pressure Vessel End Cap).[13]  In doing so, Mr. Buser explained how the program SolidWorks was used to create these files, how the program works and what sort of information can be obtained from the SolidWorks files admitted into evidence.

---

[13] Mr. Buser was also shown Exhibit 60 (Count 6, the LDUUV Interim Propulsion – Tail Section).  As with the other SolidWorks files, Mr. Buser testified regarding the information contained in this exhibit.

Mr. Buser's testimony should not have been a surprise to the defendant.  The photographs and documents identified by him, as well as the SolidWorks files Mr. Buser showed the jury had been produced in discovery.  Moreover, email communications and chats between Mr. Buser and Sparks were also produced in discovery.  *See* Government Trial Exhibits 415, 420, 422, 423, 265, 438 and 439.[14]  These communications showed that Sparks and Mr. Buser had remained in touch after Mr. Buser left the employment of LBI.  Last, Sparks supervised Mr. Buser for an extended period of time and was well familiar with the nature of his work at LBI.  In fact, Mr. Buser was listed in Sparks's witness list.  Hence, the allegation that Sparks was surprised by Mr. Buser's testimony is simply not credible.

**Mr. Flick**:      In the case of Allen Flick, his grand jury testimony was produced in discovery as well as email communications between Mr. Flick and Sparks concerning the unauthorized transmission charged in Count 17.  Most of these email communications were marked into evidence at trial.  *See* Government Trial Exhibits 334, 335, 336, 336A, 337, 340 and 166.  All of these email communications were produced in discovery as part of the Government's first discovery production of December 19, 2016.  Therefore, as of December 2016, the defendant was provided with information indicating that the Government would prove an unauthorized transmission of information made on December 7, 2011, to Mr. Flick; and was further provided with the email communications that supported the Government's allegation.  Mr. Flick's grand jury testimony was timely disclosed as *Jencks* material.  Moreover, like in the case of Mr. Buser, Sparks collaborated with Mr. Flick during the course of his employment at LBI and was well familiar with the nature of his work.  Hence, though no interview report was

---

[14] These are the chats and emails marked into evidence, additional emails and chats between Mr. Buser and Sparks were produced in discovery.

generated, based on the information provided, Sparks was aware of what Mr. Flick would say on the stand.

**Mr. Dvorak**:  Dan Dvorak was a chain of custody witness who was called to identify the computers he received from Mr. Legnos and transferred to SA Mehring as evidenced by the Chain of Custody form.  *See* Government Trial Identification 394b.  While no report of interview was generated for Mr. Dvorak, his deposition from the parallel civil case was produced in discovery to the defendant as part of the Government's first discovery production on December 19, 2016.  In addition, several email communications showing when Mr. Dvorak received the LBI computers were also disclosed to the defendant.  Sparks can hardly say that he was unprepared to meet Mr. Dvorak's testimony.

**Mr. Spark**:    Kevin Spark was a designated agency representative from Dropbox who was called to authenticate Dropbox records and explain to the jury the Dropbox application and how it worked.  As established above, the Dropbox production was included in the Government's first discovery production of December 19, 2016.  In addition, the Affidavit in support of the search warrant for Sparks's personal Dropbox account, which describes the Dropbox application and what it is, was also included in the first discovery production. Moreover, email communications between Dropbox representatives and SA Mehring were also disclosed in discovery as part of the Government's Jencks production.  Therefore, Mr. Spark's testimony was hardly a surprise to Sparks.

**Mr. Herr and Mr. Davis**:    Frank Herr and Gary Davis were called to describe for the jury the mission of their respective agencies and commands and the nature of their work.  Mr. Herr explained to the jury what Office of Naval Research ("ONR") was, the nature of the work conducted by ONR and ONR's role in the development of the technologies at issue in the case.

Mr. Davis did the same for the SPAWAR Command.  The contracts with ONR and SPAWAR were produced in discovery.  Moreover, the defendant had email communications by both Mr. Herr and Mr. Davis that made clear their role with those contracts; therefore, their testimony was also not a surprise.

**Mr. Tuttle**:     Sean Tuttle of the StoneTurn Group was a witness called by the Government to testify about the LBI files that had been found in Sparks's personal electronic devices.  Mr. Tuttle was hired by the defense (which included Sparks) in the parallel civil proceeding to review Sparks's personal electronic devices and identify LBI proprietary information.  In fact, Mr. Tuttle identified Attorney Solomon in open court as the attorney who hired him to conduct this work, which he testified he conducted with Sparks's assistance.  Thus, Sparks knew exactly who Mr. Tuttle was and what the nature of his testimony would be.  The Government disclosed all of the information provided by the StoneTurn Group as part of its first discovery production on December 19, 2016.  In addition, the Government disclosed the Certification prepared by Mr. Tuttle as a result of his review of the defendant's personal electronic devices as well as the Consent Decree the defendant filed in the civil proceeding in connection with the review of his electronic devices.[15]

Therefore, although the Government did not produce interview reports for these seven witnesses, the Government produced other information from which the defendant could ascertain what the testimony of these witnesses would be and prepare to confront that testimony at trial. The Government violated no discovery rule.

---

[15] Significantly, when the Government served a subpoena on Mr. Tuttle compelling him to testify at trial, the defendant moved to quash.  As a result, the Government was not able to speak to Mr. Tuttle until a week or so before he was scheduled to testify.  In any event, the defendant cannot validly argue that he was somehow surprised by Mr. Tuttle's testimony.

## 2.   The Government is Not Required to Produce FBI 302 Reports.

The defendant alleges that the Government failed to disclose reports of investigation prepared by FBI Special Agent Greg Stroh.  First, the Government is not required to produce reports of investigation.  Second, while it is true that SA Stroh was present for most interviews conducted during the course of the investigation in this case, SA Mehring was the only agent who took notes during those interviews and prepared interview reports.

SA Stroh prepared an interview report after meeting with ex-LBI employee Charles Lohrs.  This interview was conducted in preparation to confront the defense's case at trial.  Mr. Lohrs provided information the Government understood might have been favorable to the defense; therefore, the report was produced in discovery.  *See* Exhibit E.  In addition, SA Stroh was present during the trial preparation session with Richard Buser on June 24, 2018, when he provided potentially favorable information, s*ee* Section C-4, supra, at p. 9.  SA Stroh prepared a report summarizing the new information provided by Mr. Buser and the report was also produced in discovery.  *See* Exhibit H.

FBI agents, in addition to SA Stroh, assisted with three interviews conducted in preparation to confront the defense's case at trial.  The interviews were of proposed defense witnesses.  These three reports were not disclosed to the defense as they contained no *Brady* information.

Evidence is impermissibly suppressed only if it is material, exculpatory and unknown to the defendant.  Otherwise, as has been established, the Government's reports of investigation are privileged work product, which the Government is under no obligation to produce.  None of the three FBI reports prepared during the course of trial to confront the defendant's case contain

*Brady* information.  Therefore, the Government's decision not to produce those FBI reports does not constitute a discovery violation.

### 3.   Allegations Related to the Testimony of David Mittelman

The defendant next argues that the Government failed to disclose that Government witness David Mittelman accessed Dropbox from the LBI computer used by Sparks.  This is not correct.

### i.   Relevant Factual Background

First, on August 12, 2013, during the course of his second interview with DCIS, Mittelman was specifically asked if he used Dropbox during the course of his employment with LBI and he told SA Mehring that he had accessed his personal Dropbox account from the LBI computer he was using (the same computer Sparks used at LBI).  Accordingly, SA Mehring included the following statement in his interview report:

> Mittelman said that he has never installed the Drobox software on any computer at LBI, however, **has logged into his account in order to drag files from his account onto his LBI desktop**.  Mittelman does not recall ever transferring any files to his Dropbox account from LBI, but was not positive.

*See* Copy of Report of Interview for David Mittelman dated August 12, 2013, attached hereto as Exhibit O (emphasis added).  SA Mehring's report was produced in discovery as part of the Government's first discovery disclosure on December 19, 2016.  Therefore, the Government does not understand the defendant's allegation – it simply belies the facts of this case.  On August 12, 2013, Mittelman specifically told SA Mehring that he had accessed his personal Dropbox account from the LBI computer he was using, which was Spark's computer.

      ii.      <u>The Government Disclosed Mittelman's Access to Dropbox through Other Evidence</u>.

Not only did the Government disclose the fact that Mittelman accessed Dropbox from Sparks's LBI computer through his report of interview of August 12, 2013; but also through the disclosure of the mirror image of Sparks's LBI computer and the disclosure of the reports of the DCFL.  Together, these three pieces of information make clear that Mittelman had accessed Dropbox through Dropbox.com from the same LBI computer Sparks used.

Specifically, as part of its first discovery production, the Government produced two DCFL reports dated October 22, 2012 and August 13, 2014.  Given their size, the reports were produced on two thumb drives. The materials provided included both the findings from the data analyzed and the examiner's notes.  The October 22, 2012 forensic examination by DCFL, as set forth in Report Item #3, contains the internet history that was pulled from Sparks's LBI computer by the forensic examiner.  *See* Forensic Report dated October 22, 2012, p. 7, attached hereto as Exhibit P.  One of the files provided by DCFL (tag50_itemC_hd_001_selecte_internet_history.pdf) contains select internet history from Sparks's LBI computer.  A simple search within this file for the term Dropbox reveals each instance Dropbox was accessed from Sparks's LBI computer, including access to Dropbox after Sparks terminated his employment, and Mittelman began using the computer.

Therefore, the defendant's allegation that the Government failed to disclose Mittelman's access to Dropbox from Sparks's LBI computer is simply false.  Sparks's own computer forensic examiner, Mr. Mark Spencer, who was qualified as an expert by the Court, reviewed all of the reports generated by DCFL examiners as well as the mirror image of Sparks's LBI computer and confirmed Mittelman's access to Dropbox.com from that computer.  In fact, during her opening statement Sparks's counsel referenced the number of times the defense claimed Mittelman

accessed Dropbox from the same computer used by Sparks.  *See* Trial Transcript of June 11, 2018, pp. 58-59.  And in his motion, Sparks admits that he "had some idea about Mittelman's Dropbox use while present at LBI."  Def. Mot. at p. 15.  Therefore, Sparks had all the information he needed to investigate such use further.  Thus, Sparks argument in this regard has no merit and cannot serve as a basis for an *in camera* inspection of Government documents, much less, an evidentiary hearing.

Sparks further claims that the defense (and their expert) had no way of knowing, among other things, the extent of Mittelman's Dropbox usage; the purposes for which he used Dropbox; the contents of his Dropbox account; that Mittelman routinely used his personal Dropbox account for personal business; or that Mittelman uploaded and/or downloaded LBI proprietary information on a routine basis.  This too is not correct.  Having been provided with two interview reports documenting that Mittelman used Dropbox to transfer files to his LBI computer, that he accessed Dropbox from that computer, and Mittelman's identity, the defendant was free to interview Mittelman in this regard, which he admittedly did.  The defendant could have also sought additional information from Dropbox, he chose not to.

### iii.   Sparks Knew Other LBI Employees Did Not Use Dropbox.

Sparks's allegation that he was somehow prevented from timely investigating whether other LBI employees used Dropbox is also false.  When an LBI employee (Mittelman) informed that he used Dropbox, the Government disclosed the information.  Further, Sparks called three ex-LBI employees to the stand during trial, not one had a Dropbox account, or used Dropbox during the course of their employment with LBI.  Moreover, there was nothing preventing Sparks from interviewing other LBI employees regarding Dropbox.

33

iv.    The Government Made Timely Disclosure of Potential *Giglio* Information.

Sparks claims that the Government did not timely disclose potential *Giglio* information

related to Mr. Mittelman.  This is not correct.

On June 18, 2018, during the course of a trial preparation session, Mittelman

discovered that he still had an LBI file on his LBI folder within his personal Dropbox Account.

SA Chris Mehring summarized the information in a report that was produced to the defense in

court the next day on June 19, 2018.  *See* Exhibit I.  This information led the Government to seek

consent from Mr. Mittelman to obtain his Dropbox logs, which he provided.  Dropbox produced

Mr. Mittelman's logs on June 19, 2018.  The production was password protected.  The

Government gained access to the production at approximately 6:00 pm, in the evening of June

19, 2018.  After reviewing the records, the Government promptly disclosed the records to the

defense the next day, June 20, 2018.  *See* Exhibit J.  The Government acted as expeditiously as it

could under the circumstances.  No evidence was suppressed.  If the defendant thought it needed

more time to prepare to use this information to cross-examine Mittelman, he could have asked to

cross-examine Mittelman at a later time – he did not.

Sparks also faults the Government for not investigating further Mittelman's usage of

Dropbox.  However, when the Government learned about the existence of an LBI file in Mr.

Mittelman's personal Dropbox account it sought and obtained his consent to obtain his Dropbox

logs, and produced them to the defense.  Therefore, the Government properly investigated the

matter.

v.    The Government Produced All Email Communications of Mr. Mittelman
      in its Possession

Sparks further "seeks copies of all emails and any other documents provided to the

prosecution team by David Mittelman."  The Government obtained 20 email communications

between Mr. Mittelman and his then LBI supervisor Matt Jewel.  All 20 communications were

provided in discovery to the defense.  *See* Exhibit L.  Five were marked into evidence.  *See*

Government Trial Exhibits 441, 443, 444, 445 and 446.  Therefore, the Government produced all

email communications in its possession.

vi.     <u>The Government Complied With Its <em>Giglio</em> Obligations</u>

Last, shortly before Mittelman was scheduled to take the stand, the Government learned

that Mittelman had a medical discharge from the U.S. Navy in 2006.[16]  The Government did not

consider this information to be *Giglio* information, but because the Government learned of the

information shortly before Mittelman was to take the stand, out of an abundance of caution, the

Government conveyed the information to the defense orally in court.  Sparks argues that the

disclosure was untimely, and thus, he was not able to use the information effectively in cross-

examination, though he fails to state how he would have made use of the information or how the

information would have affected the outcome of the trial.

Any impeachment value of the information was minimal at best.  A medical discharge is

hardly a fact that bears upon an individual's credibility.  Moreover, there was substantial other

evidence that Sparks used to try to impeach Mr. Mittelman's testimony.  Indeed, Sparks admits

that a significant part of his trial strategy was the impeachment of Mr.  Mittelman.  Sparks's

cross-examination aggressively attacked Mr. Mittelman's credibility on numerous grounds,

including his use of Drobox; the number of files he uploaded to Dropbox; his relationship with

Peter Legnos and his desire to go into business with Mr. Legnos; his start-up company; and the

number of LBI files he still had in his personal Dropbox account.  Thus, Sparks has failed to

---

[16] The Government will supplement this argument in a sealed filing.

show that cross-examination of Mr. Mittelman on the potentially sensitive topic of a military

medical discharge would have changed the outcome of the case.

    4.  <u>Defense Allegations Related to the Testimony of Richard Buser</u>

  The defendant claims that the Government called Richard Buser as a "quasi-expert "and

failed to provide the defendant with adequate notice.  This is not accurate.

    i.  <u>Relevant Factual Background - The Testimony of Richard Buser</u>

  Richard Buser is a mechanical engineer employed by LBI immediately after his college

graduation.  He worked for LBI from late May 2010 until February 2011.  He was called to

testify by the Government because he designed three of the SolidWorks files charged in the

Indictment, specifically the files charged in Count 4 (the Sphere); Count 5 (the LVC Motor); and

Count 7 (the Pressure Vessel End Cap).  Mr. Buser, as did Peter Legnos, David Mittelman,

Francine Brodeur, Charles Lohrs, Brian McNamara and Mark Spencer, identified a number of

photographs of LBI, and a number of employee documents, such as Non-Disclosure Agreements

and Non-Compete Agreements.  Mr. Buser then testified about the process of creating the files

that were charged in Counts 4, 5 and 7.  He also identified Government Trial Exhibits 58 (Count

4, the Sphere); 59 (Count 5, the LVC Motor) and 61 (Count 7, the Pressure Vessel End Cap).

  In addition, Mr. Buser explained how the program SolidWorks was used to create these

files, how the program works and what sort of information can be obtained from the SolidWorks

files charged in the indictment.  Mr. Buser was also shown Exhibit 61 (Count 6, the LDUUV

Interim Propulsion – Tail Section).  As with the other SolidWorks files, Mr. Buser testified

regarding the information contained in this exhibit.  In this regard, Mr. Buser was strictly a

factual witness as he testified based on his personal knowledge and experience using

SolidWorks.  Each of the SolidWorks files, Exhibits 57 to 61, had been shown to and identified

by Mr. Peter Legnos, and had been admitted into evidence.  *See* Trial Transcript of Peter Legnos,

June 12, 2018, pp. 26-27; 112; 117; 164-65 and 168.

ii.      Richard Buser was not an expert witness

Sparks attempts to place Mr. Buser in a "quasi-expert" category.  The defendant argues

that the Government called Mr. Buser knowing the defense would not rely on the expert

testimony of Mr. Good.  This allegation is belied by the record.  Mr. Buser was on the

Government's witness list from the start of trial on June 6, 2018.  Moreover, his testimony was

purely factual in nature and could have hardly come as a surprise to the defense given the

numerous email communications and chats that were produced in discovery between Mr. Buser

and Sparks.  Moreover, Sparks was Mr. Buser's direct supervisor at LBI for a significant part of

his employment.  That a mechanical engineer such as Mr. Buser, tasked with designing

technologies, would have intricate knowledge of SolidWorks is hardly shocking.

Sparks further claims that the Government failed to provide any discovery regarding Mr.

Buser's "quasi-expert role."  The defendant's argument is that, according to email

communications and chats produced in discovery, "Buser was highly critical of and displayed

great hostility toward Peter Legnos;" therefore, the Government violated Rule 16, the Standing

Order and USAO official policy by failing to provide any discovery about Mr. Buser's "quasi-

expert role."  The argument not only lacks logic, but it lacks a complete basis in law.  There is no

provision of Rule 16, the Court's Standing Order or USAO official policy that provides for

notice of "quasi-experts."  The fact is that Mr. Buser did not testify as an expert and the

Government did not violate any provision of law, local rule or office policy.[17]

---

[17] In footnote 5 of his motion, Sparks speculates that the expert the prosecution team consulted in relation to the expected testimony of Michael Good was Richard Buser.  It was not.  Again, Richard Buser was always viewed and testified as a fact-based witness.

    iii.    <u>The Government is not obligated to produce handwritten notes</u>.

Sparks argues that the Government engaged in discovery violations regarding Mr. Buser by failing to disclose any interview reports or handwritten notes corresponding to such interviews. Again, as established above, the Government did not generate any interview reports related to Mr. Buser. Moreover, the Government is under no obligation under Rule 16, *Brady* or any other provision of law to disclose handwritten notes, unless they constitute *Jencks*, which they did not, or they contain *Brady* information, which they did not.[18] When favorable information was provided by Mr. Buser during a trial preparation session, it was disclosed. *See* Section C-4, *supra*, at p. 9.

The Government's decision not to produce in discovery handwritten notes from trial preparation sessions that it has no obligation to produce cannot support an order for full disclosure of government privileged work product. Indeed, the Supreme Court has made clear that such an order is **never** appropriate. *Ritchie*, 480 U.S. at 59 ("a defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files."). Even when a potential violation of *Brady* has been established, as was the case in *Ritchie*, a defendant is not entitled to rummage through government files. Only the information deemed to be *Brady* information is to be disclosed. *Id*. at 47 (rejecting lower court's view that the defendant was entitled to have "records reviewed by 'the eyes and perspective of an

---

[18] Sparks alleges that: "In the week or so before his testimony, Buser met with the prosecution team on several more occasions, including once for a full eight (8) hour day." This is incorrect. Mr. Buser was expected to testify the week of June 18, 2018. He arrived in Connecticut on June 20, 2018, but would not take the stand that week, and returned home on Friday June 22, without meeting with the prosecution team, though he was at the USAO for extended periods of time in case he was called to the stand. Mr. Buser was flown back on Sunday, June 24th, when he did meet with a member of the prosecution team - the meeting that generated the disclosure made on June 25. *See* Section C-4, *supra*, at p. 9. The prosecutor met again with Mr. Buser on June 25 to discuss recently received Exhibits 460, 461 and 462. Mr. Buser took the stand on June 26, 2018.

advocate,' who may see relevance in places that a neutral judge would not."); *see id.* at 60

(allowing the defense full disclosure would deny the Commonwealth's compelling interest in

protecting child-abuse information).  Therefore, the defendant's request for full disclosure of the

Prosecution's team's notes is inappropriate and unwarranted.

      iv.    The Government did not withhold *Brady* information.

Sparks alleges that the handwritten notes produced by the Government corresponding to

Richard Buser's first interview, conducted on May 3, 2018, contain a "wealth of exculpatory

information."  They do not.  None of the information provided by Mr. Buser was in any way

exculpatory or impeaching.  From the four pages of notes produced Sparks extrapolates nine

statements he argues constitute exculpatory information.  As established above, "evidence is

'material' within the meaning of *Brady* when there is a reasonable probability that, had the

evidence been disclosed, the result of the proceeding would have been different," such that the

failure to disclose "'undermine[s] confidence in the verdict.'"  *Bell, supra*, 556 U.S. at 469–70.

But here, the information was disclosed; therefore, it can hardly be argued that the information,

even if it had been suppressed could have changed the outcome of the trial.  Therefore, the

information was necessarily not material.  The Government addresses each of the statements

listed by Sparks below.

      a.    Legnos "did not necessarily get people in trouble for security violations"

Sparks argues that the statement to the effect that Mr. Legnos "did not necessarily get

people in trouble for security violations" is exculpatory and should have been disclosed.  This

information was not exculpatory within the meaning of *Brady*.  Mr. Buser was not a member of

the LBI administration and provided no examples of security violations for which other

employees did not get in trouble.  Thus, given that he had no personal knowledge of the subject,

this statement was not material.  In any event, a close look at the discovery provided reveals that the Government indeed provided information concerning Mr. Legnos not adhering strictly to some of his security policies.  Evidence is not considered suppressed within the meaning of *Brady* if the defendant or his attorney either knew, or should have known, of the essential facts permitting him to take advantage of the evidence.  *Paulino*, *supra*, 445 F.3d at 225.

It was clear from the discovery provided prior to trial that not every security violation by an LBI employee resulted in a warning to an employee.  For example, on July 7, 2016, Mr. Legnos told SA Mehring that Sparks was warned at least half a dozen times before he was finally formally reprimanded for using unauthorized devices on LBI's network.  *See* Report of Interview of Peter Legnos dated July 7, 2016, p. 1, attached hereto as Exhibit Q.  During the course of an interview on September 7, 2016, Mr. Legnos stated that he did not think the LBI's policy regarding USB or external storage devices went into effect until the Spring or Summer of 2011. *See* Report of Interview of Peter Legnos dated September 7, 2016, p. 3, attached hereto as Exhibit R.  Moreover, on November 6, 2012, Francine Brodeur, ex-LBI Office Manager advised SA Mehring that although it was against office policy to connect USB devices to the LBI network, employees were physically able to do so.  In addition, she stated that though she had caught Sparks connecting unauthorized devices to the network on multiple occasions he had only been issued one written warning.  *See* Report of Interview of Francine Brodeur dated November 6, 2012, attached hereto as Exhibit S.  In addition, during the course of his June 12, 2012 deposition, which was provided in discovery, Mr. Legnos admits that there were repeated security violations by employees that did not result in formal reprimands.  *See* Excerpt of Deposition of Peter Legnos dated June 12, 2012, pp. 206-14, attached hereto as Exhibit T.

Therefore, the defendant was informed of the referenced information through other discovery provided in the case, thus, there was no suppression of evidence.  Moreover, Sparks was a supervisor at LBI for a significant part of time during which he would have been tasked with enforcing security policies.  Thus, if security policies were not strictly enforced at LBI, by virtue of his position at LBI, the defendant would have been aware of that fact.  At best, this information would have been cumulative of other information that had already been disclosed in discovery.  Thus, it was not material.

      b.      "<u>LBI employees did not receive guidance on security</u>"

Sparks claims that the statement "LBI employees did not receive guidance on security" is exculpatory and should have been disclosed.  First, this is not what is contained in SA Mehring's notes.  Rather, what SA Mehring wrote down was as follows:

> Thumb drives – Did not get guidance (recall)

*See* Copy of page 3 of SA Mehring handwritten notes of Interview of Richard Buser dated May 3, 2018, attached hereto as Exhibit U.  Therefore, what Mr. Buser stated was that he did not recall getting guidance on the use of thumb drives.  As stated above, the Government provided several interviews of Peter Legnos and Francine Brodeur wherein they stated that LBI had a policy regarding the use of thumb drives.  Mr. Buser did not state that he received no such guidance, but that he could not recall if he did.  This statement is not exculpatory.

      c.      "<u>Buser had used his personal computer to access the LBI network so he could listen to music while he worked</u>"

Again, Sparks misrepresents what is contained in SA Mehring's notes.  What is contained in SA Mehring's notes reads as follows:

> Security to get building
> Had my own code
> Doors locked

> Personal devices a couple of times
> Accessed network – to listen to
> Music – wifi
> File server – only w/ an LBI computer

*See* Exhibit U.  As Mr. Legnos testified at trial, LBI had access to wifi, which was password

protected.  What Mr. Buser informed was that he used his personal computer to access LBI wifi

to listen to music.  But he made clear that the LBI File server could only be accessed with an LBI

computer.  This statement is not exculpatory within the meaning of *Brady*.

   d.   "In 2014, Metron terminated a job interview with Buser upon learning he had
        worked for LBI."

This statement is in no way exculpatory within the meaning of *Brady*.  The fact that Mr.

Buser's interview with Metron was terminated when they learned that he had worked at LBI,

three years after all relevant events, has no bearing on the issues of the case.  At most, it shows

the industry well understood the dangers of hiring employees who worked for a competitor.

   e.   "Buser had asked Dr. Dan Deitz for a recommendation to help him find a
        new position."

Again, this statement is in no way exculpatory within the meaning of *Brady*.  The fact

that Mr. Buser had asked Mr. Deitz for a recommendation has no bearing on the issues of the

case.

   f.   "Buser was 'not sure' if Dr. Deitz had 'offered anything like a job w/DS [Sparks]
        & JW [Williams]'"

Again, this statement is in no way exculpatory within the meaning of *Brady*.  The fact

that Mr. Buser had no knowledge about whether or not Mr. Deitz offered a job to Sparks or

Williams is not material.

g.     "Legnos was 'tough to work for' and within a five (5) year period of time, more than seventy (70) LBI employees quit or were fired."

First, while Mr. Buser told SA Mehring that Mr. Legnos was tough to work for, he also stated that he had no problems with Mr. Legnos.

> Peter – tough to work for
> No problems w/ Peter
> Took me out in boat – 1x every couple of weeks
> Left for better opportunity

See Copy of p. 1 of SA Mehring's Handwritten Notes from Interview of Richard Buser dated May 3, 2018, attached hereto as Exhibit V.  This information is not exculpatory within the meaning of *Brady*.

In any event, the fact that Mr. Legnos was "tough to work for" and that there was a lot of employee turnover at LBI was information that had already been provided in discovery to the defendant through at least one other report of interview, specifically the report of interview of Courtney Murphy (did not like working for the President, Peter Legnos, as he was extremely temperamental… Legnos fired 15 different people just during the limited time she was there). See Copy of Report of Interview of Courtney Murphy attached hereto as Exhibit W.

In addition, the fact that Mr. Legnos was tough to work for and that LBI had a lot of turnover was information that would have been known by the defendant as he was a supervisor at LBI for over a year.  In fact, at trial, Sparks's counsel questioned each of the defense witnesses who were ex-LBI employees, to wit, Mark Spencer, Charles Lohrs and John McNamara, about this very issue.  Therefore, it is clear that the defendant was well aware of this information.

h.     "Buser did not recall the LBI computers being "wiped," as prosecution witness Francine Brodeur accused Sparks of doing."

This statement is also not exculpatory or impeaching.  Mr. Buser told SA Mehring that he did not recall the computers being wiped, not that they were not wiped.  Moreover, at least one

email communication produced in discovery indicated that Sparks indeed switched computers while he was in charge of LBI.  *See* Government Trial Exhibit 415.

        i.      "<u>When Buser began at LBI, he was assigned a new user name, contrary to Brodeur insisting that the same generic usernames were recycled over and over again and Mittelman's insistence that the 'Dylan2' username was assigned to him</u>."

What the SA Mehring's handwritten notes state is:

UN – new username
Took over another computer – still work product on it – Heidi (M/Engineer)
Did same thing as Heidi

The information provided by Mr. Buser is consistent with the information provided by other witnesses, including Ms. Brodeur and Mr. Mittelman – that new engineers were given access to the work product of the engineer they replaced.  Moreover, the forensic examination revealed that Ms. Brodeur in fact assigned generic usernames as evidenced by Jay Williams's username of ENGR.  *See* Trial Transcript of Computer Forensic Examiner Alexander Zaferiou, June 27, 2018, at p. 51; June 28, 2018, at p. 8.  Moreover, Mr. Zaferiou  also confirmed that Mr. Mittelman signed into Sparks's LBI computer using the username of "Dylan2," giving Mr. Mittelman access to Sparks's files.  *See* Trial Transcript of Computer Forensic Examiner Alexander Zaferiou, June 27, 2018, at pp. 65-69; June 28, 2018, at pp. 29-30.

      Moreover, taking the defendant's argument to its logical conclusion, according to Mr. Buser, the computer security measures were actually stricter than Ms. Brodeur claimed.  It is unclear how this information would have been useful to the defense.  If anything, it supports the fact that LBI had strong computer controls.  The statement is simply not exculpatory.

        5.   <u>The Allegations Related to the Testimony of Kevin Spark</u>

      Sparks claims that he had no interview report for Government witness Kevin Spark.  In preparation for trial, the Government asked Dropbox to designate a witness who could

testify at trial to authenticate the Dropbox production, describe the Dropbox application and

explain to the jury how Dropbox worked.  Dropbox provided a business certification

authenticating the Dropbox production corresponding to Sparks's personal Dropbox account.

*See* Copy of Dropbox Certification, marked as Government Trial Exhibit 260.  However,

Dropbox did not designate a witness for testimony at trial until on or about May 11, 2018, when

it designated in-house counsel Kevin Spark.  The Government had previously communicated

with Mr. Spark regarding a number of questions it had in anticipation of trial and produced any

*Jencks* material pertaining to Mr. Spark on June 4, 2018, in compliance with the Court's

scheduling order.  However, no report of interview was generated as a result of the

Government's communications with Mr. Spark.

Again, the Government submits it was under no obligation to generate a report of

interview for Mr. Spark.  Moreover, that Sparks was somehow surprised by the testimony of Mr.

Spark is not credible.  In light of the information provided in the first discovery disclosure,

Sparks was aware that a central part of the Government's case would be the information obtained

through the search warrant executed on Sparks's personal Dropbox account.  The Affidavit

submitted in support of the search warrant for the defendant's Dropbox account described the

Dropbox application and how it worked:

> Dropbox, Inc.("Dropbox") is a company whose service ("Dropbox service")
> consists of backing up data and the ability to easily share data among parties.
> According to the web-site for Dropbox *"Dropbox is a free service that lets you bring*
> *your photos, docs, and videos anywhere and share them easily. Never email yourself*
> *a file again!"* Dropbox is headquartered in San Francisco, CA.

> Information obtained from Dropbox indicates that all computers in any
> Dropbox service user group will automatically synchronize with each other any time
> a document is added or altered on any of the computers associated with that user
> group.  The identity of the individuals who synchronizes data with the user group
> that SPARKS was associated with can only be revealed with a search warrant. Thus,
> the identities of these users are unknown at this time. Additionally, Dropbox also
> advised that any particular user in a user group can add other users to that same user

group without the consent of the original user group members. Thus, it is possible that any data that SPARKS may have moved to the Dropbox folder was shared with other users and beyond the group members that he is aware of.  Dropbox also advised that data can be recovered from a particular account for a period of time, usually one month, after the time that a user deletes the data, and that deleted data can also be searched for on its servers by Dropbox and provided to law enforcement provided that it is specified in a search warrant.

*See* Copy of Affidavit in Support of Search Warrant, par. 14-15, attached hereto as Exhibit X.

That the Government would call a witness designated by Dropbox to testify as to the information contained in Exhibit 260 above, and other relevant information regarding Dropbox simply should not have surprised the defendant.  Moreover, in light of Sparks's refusal prior to trial to stipulate to the authenticity of the Dropbox production, he knew a Dropbox witness would appear at trial.

Defendant's argument is tantamount to the Government calling a witness from Sprint to authenticate cellular telephone records, explain the information contained in those records and how Sprint cellular service works, and the defendant objecting because he had no idea what the witness would say and had no investigative report regarding the witness's testimony.  It would be fair to say that the Government generally does not generate a report regarding expected testimony from designated company representatives.  As demonstrated above, the failure to generate a report does not constitute a discovery violation.  Moreover, the defendant's allegation that he was surprised by Mr. Spark's testimony is difficult to understand and unsubstantiated by the record.

Sparks further argues that Mr. Spark did not authenticate his Dropbox logs.  But the Government submitted a business certification that served as the authentication of the records, and they were thus properly admitted into evidence.

Last Sparks argues that he cannot be sure that the Government sent the original Dropbox production back to Dropbox so that it could be properly authenticated.  But this is

exactly what Mr. Spark testified.  *See* Trial Transcript of Kevin Spark, June 20, 2018, pp. 39-43.

6.   The Government did not misrepresent facts during plea negotiations.

Sparks next alleges that the Government misrepresented facts during the course of plea negotiations.  Specifically, he alleges that the prosecutors stated during the course of plea negotiations that "Susan Paolini, the former ONR contract officer who oversaw LBI's 0397 contract, would testify that **but for** Sparks and Williams going to CRA, Paolini would not have approved the expansion of CRA's contract 0405."

The Defendant again misrepresents the facts.  The representations of the prosecution regarding the expected testimony of Susan Paolini were summarized in a memorandum sent to Sparks on March 19, 2018, in furtherance of plea negotiations.  That memorandum stated as follows in pertinent part:

> Peter Legnos would testify that the statement of work in the 0405 contract expansion covers work that was previously outlined for LBI under the 0397 contract statement of work.  Furthermore, *Sue Pailini [sic] would testify that she was concerned when Dan Dietz wanted to transfer the 0397 LBI contract to CRA through the 0405 expansion because the 0397 work was almost done and she saw the 0405 expansion as redundant of the work that LBI was doing under 0397.  Pailini [sic] would also testify that she asked Dan to re-write the 0405 expansion statement of work based upon these concerns and after some revisions, she ok'ed the expansion based on Deitz's representations*.

*See* Loss Calculation Memo attached hereto as Exhibit EE.  The Government's representations above were completely consistent with information provided by Ms. Paolini during the course of her interview with SA Mehring on May 8, 2013, dislcosed to the defense on December 19, 2016.  *See* Copy of Interview Report of Susan Paolini dated May 8, 2013, attached hereto as Exhibit Y.  During the course of that interview Ms. Paolini stated that modification 10 to CRA contract 0405 expanded CRA's role from software development to that of system integration and testing.  *Id*. at

p. 1.  Ms. Paolini stated that prior to the award of the 0405 contract, she had concerns with the proposed contract and vocalized those concerns to Mr. Deitz.  *Id*.  Ms. Paolini told SA Mehring that she told Mr. Deitz that the 0405 contract was very similar to the LBI contract 0397, which, at that time, was almost completed by LBI.  *Id*.  Ms. Paolini stated that her initial concern was that the Government may be paying for redundant work.  Id.  Ms. Paolini further informed that due to the concerns that she voiced, Mr. Deitz rewrote the contract to be clearer.  *Id*.  Susan Paolini's trial testimony was wholly consistent with the above summary.

      7.  <u>The Government did not withhold any *Brady* information related to Mr.<br>Daniel Deitz</u>

      i.  <u>The Government did not interfere with the defendant's access to the<br>testimony of Mr. Deitz</u>.

Sparks claims that the prosecution "backtracked" from its commitment to make sure that ONR Program Officer Daniel Deitz was available for trial.  This is not true.  The Government subpoenaed Mr. Deitz, and advised him that if the Government did not call him to testify, the defense would likely call him in their defense case.  The Government obtained a commitment from Mr. Deitz to make himself available should the defense call him to the stand, and in fact he did.

Sparks complains about having had to comply with the Touhy regulations.  The defendant does not claim to have been unaware of the Touhy regulations or its requirements.  Rather, he claims that the Government, by agreeing to make Mr. Deitz available, somehow had agreed to waive the regulation.  But the Government cannot and did not waive Touhy requirements, which exist to protect information belonging to the agency of the witness.  *See* 32 C.F.R. Part 725.  In this case, Part 725.2 specifically prohibits Department of Navy ("DON")

personnel from providing information, either through interview or testimony without prior authorization.

Sparks further complains that he had to comply with the Touhy regulations and submit his direct examination for the approval of ONR counsel, "who required entire questions and topics to be abandoned." The defendant, however, fails to specify what questions and topics he was forced to abandon, or how that information would have changed the outcome of the trial. Sparks only states that Mr. Deitz could not testify about "his opinions, ONR policy, and other matters."

Regarding Mr. Deitz's opinions or ONR Policy, Part 725.2 specifically provides:

> DON personnel shall not provide, with or without compensation, opinion or expert testimony concerning official DON or Department of Defense (DOD) information, subjects, personnel, or activities, except on behalf of the United States or a party represented by the Department of Justice, or with the written special authorization required by this part.

Therefore, applicable regulations forbid DON personnel from providing opinions or expert testimony. And in any event Mr. Deitz was not notified as an expert witness by the defense; therefore, he would not have been able to provide any opinion testimony. Hence, the defendant has failed to demonstrate how this limitation could have affected the outcome of the case.

Further, Sparks fails to set forth what ONR policies he would have questioned Mr. Deitz about, or what matters he was prevented from inquiring about that would have affected the outcome of the case. Therefore, no discovery violation took place and no further disclosure or inquiry is warranted in this regard.

ii.   The Government was not required to disclose handwritten notes.

Sparks further complaints that the Government only disclosed in discovery one interview report for Mr. Deitz, and was not provided with the handwritten notes of the trial preparation

sessions the Government had with Mr. Deitz prior to trial.  As such the defendant had no idea

what Mr. Deitz was shown.  First, the defendant had a 9-page report from an interview of Mr.

Deitz, which had more than 50 attachments that consisted of photographs and other documents

shown to Mr. Deitz during the course of the interview.  *See* Copy of Report of Interview of

Daniel Deitz, attached hereto as Exhibit Z.

      Second, again the defendant makes a *quantum* leap and argues that the handwritten notes

from the Government's trial preparation sessions must contain exculpatory information.  But as

has been established above, the Government is under no obligation to disclose those notes, unless

they contain *Brady* information, which they did not.  Further, arguments based on speculation are

insufficient to support a motion to compel disclosure, or trigger either an *in camera* review or a

hearing.

      In an effort to support his speculative claim, the defendant cites a single fact from the

testimony of Mr. Deitz where he testified that he was so "disturbed" by Mr. Legnos's aerial and

physical surveillance of Sparks, Williams and CRA and the LD1 and LD2 that he referred the

matter for a defense security investigation.  Sparks claims that he first learned of this fact at trial.

      But the fact that Mr. Deitz referred the matter of Mr. Legnos's surveillance for a defense

security investigation is not exculpatory within the meaning of *Brady*.  Second, once again, the

defendant misrepresents the facts that have been produced in discovery.  The defense was well

aware of the fact that Mr. Legnos had conducted surveillance of Sparks, Williams and CRA, and

further that Mr. Deitz was concerned about this.  During the course of her interview with SA

Mehring on May 8, 2013, Ms. Paolini recalled that Mr. Deitz had informed her that he was

concerned that Mr. Legnos hired private investigators to surveil the front gates of CRA.  *See*

Exhibit Y, at p. 3.  Ms. Paolini did not mention the fact that Mr. Deitz had referred the matter for

a defense security investigation, but the information disclosed by the Government certainly provided the defendant with sufficient information to investigate or inquire further.

The defendant cites *United States v. Espinal*, 96 F.Supp.3d 53 (S.D.N.Y. 2015), in support of his argument; however, *Espinal* dealt with completely different facts.  In *Espinal*, a witness testified before the Grand Jury and provided exculpatory information.  The Government failed to disclose the grand jury transcript.  Here, the Government has not failed to disclose any exculpatory information.  Absent the existence of *Brady* information, the Government is under no obligation to disclose handwritten notes.

### iii.    The Government produced all relevant emails by Mr. Daniel Deitz

Last, Sparks argues that he has "no way of knowing whether the prosecution turned over all relevant emails or what criteria they used for disclosing some emails but not others."  Again, this is the type of speculation that cannot support further disclosures or inquiries.  The defendant is making a general argument that presumes that additional relevant information exists, without specifying what information they are looking for that they deem is material to their defense.

### 8.   Allegations related to the testimony of Mark Spencer

Sparks alleges that the Government interviewed Mark Spencer, an ex-LBI employee, and that Spencer told the Government that "LBI may have engaged in improper billing under its ONR contracts and that LBI sold defective AXIB Buoys."  This is false.

An FBI agent in fact interviewed Mark Spencer in preparation to confront his testimony at trial and a 302 report was prepared.  However, Mr. Spencer did not tell the FBI that LBI engaged in improper billing under its ONR contracts, or that LBI sold defective AXIB buoys. The Government proposes that the Court conduct an *in camera* inspection of the FBI 302 report

of Mr. Spencer's interview to confirm that Mr. Spencer did not provide the alleged information to the FBI.

The defendant further alleges that the prosecutor lacked good faith in cross-examining Mr. Spencer regarding whether he intended to go into the buoy business. The cross-examination of Mr. Spencer in this regard was not based on his prior interview, but rather on email communications between Mr. Spencer and Sparks, which were marked into evidence. *See* Government Trial Exhibits 508, 509, 511, 512, 514, and 515. Moreover, during cross-examination, Mr. Spencer admitted having thought about going into the buoy business.

9. <u>Allegations related to the testimony of Sean Tuttle of StoneTurn Group</u>

The prosecution called Sean Tuttle of the StoneTurn Group to testify about the LBI files that had been found in Sparks's personal electronic devices. Mr. Tuttle was hired by the defense (which included Sparks) in the parallel civil proceeding to review Sparks's personal electronic devices and identify LBI proprietary information. The LBI files identified by Mr. Tuttle and provided to LBI in civil discovery were obtained by the Government through grand jury subpoena and produced in discovery to the defendant in the Government's first discovery production of December 19, 2016. During a trial preparation interview, the Government learned that Mr. Tuttle, *during the course of his original review*, had prepared a spreadsheet that listed all of the LBI files identified. The Government requested a copy of the spreadsheet. It was received on June 20, 2018, and the same was provided to the defense in discovery on June 21, 2018, and marked into evidence at trial on June 22, 2018. *See* Government Trial Exhibit 449.[19] There was no discovery violation with respect to Sean Tuttle.

---

[19] The Government is submitting the original Exhibit 449 to the Court. Given its size it is not being filed electronically.

10. <u>Allegations related to the testimony of Allen Flick</u>

Sparks extrapolates a number of statements contained in SA Mehring's interview notes for Mr. Flick, which he argues constitute exculpatory information that should have been disclosed – it was.  Def. Mot. at pp. 24-25.  Seven of the statements relate to Flick's work with the battery box.  They include the following:

    a.  While Sparks had "designed first electric boards," Flick had been "fixing them"

    b.  Flick, not Sparks, "wrote software for battery to talk to battery controllers & code on the controller"

    c.  Flick "was programming PICS for the battery box"

    d.  Flick "had to fix design of [Pic] Kit to [he] could program the PIC"

    e.  The battery box required three or four boards, not just the one Sparks emailed on December 7, 2011

    f.  Flick had initiated contact with Sparks on December 7, 2011 because it was the "path of least resistance"

    g.  Flick asked for Sparks's help because "we needed to solve a problem"

Evidence regarding Flick's work on the battery box and his collaboration with Sparks in resolving some of the issues with his circuit design was known to the defense at least since the first discovery production on December 19, 2016.  For example, the trade secret charged in Count Eight shows that the Battery Box had four battery banks.  Sparks, being an electrical engineer would know that four circuit boards would be required.  Moreover, information was also disclosed by the Government in discovery through the numerous email communications between Flick and Sparks and other colleagues, many of which were marked into evidence at trial.  *See* Government Trial Exhibits 334, 335, 336, 336A, 337, 340 and 166.  For example, in Government Exhibit 334, an email communication dated December 7, 2011, between Flick and John Houston, Flick states that he is waiting for Sparks to respond, clearly indicating that he

reached out to him asking for the circuit board design.  John Houston responds:  "doesn't Sparks's board have known issues?"  In fact, highlighting the collaboration between Flick and Sparks was the defendant's clear strategy in his cross-examination of Flick and it may have worked as the jury acquitted Sparks of Count Seventeen.

The Government also disclosed Allen Flick's Grand Jury Transcript, submitted for the Court's review under seal as Exhibit AA.   During the course of his testimony, Mr. Flick was asked the same questions he was asked at trial, and for the most part, provided the same answers. The interview notes of SA Mehring did not contain any additional information that can be characterized as *Brady*.

Sparks next references two statements related to Dan Deitz, which he claims were discoverable under *Brady*, as follows:

> a.  Dr. Deitz would have given Flick a recommendation if he asked
>
> b.  Dr. Deitz wanted an employee of LBI, Metron, and CRA to receive trainings on the Remus glider (whereas Legnos testified ….)

Neither statement can be remotely characterized as exculpatory and Sparks fails to state why the statements would have been discoverable under *Brady* or would have changed the outcome of the case if the Government had failed to disclose them.  Whether or not Dr. Deitz would have given Flick a recommendation is simply not relevant to any issue in the case.  Neither is the fact that Dr. Deitz wanted an employee of LBI, Metron and CRA to receive trainings on the Remus glider.  In any event, this last fact was disclosed through other discovery in the case, such as the interview reports of Mr. Legnos and email communications produced.  *See* Government Trial Exhibit 317.

Sparks alleges that two statements made by Mr. Flick regarding Mr. Legnos were also exculpatory and should have been disclosed.  Specifically, Sparks lists the following statements:

    c.  Legnos is "unhinged" and often yelled

    d.  Legnos "oftentimes … didn't do what he was supposed to do"

First, what the notes state is the following:

> Peter was unhinged. yelling
> Oftentimes he didn't do what he was supposed to
> Not sure who said it – probably Dan

Thus, regarding the first note, it is unclear if Mr. Flick was speaking about a specific event, or a regular occurrence.  In any event, the information about Mr. Legnos yelling in his place of employment was disclosed in discovery.  During the June 4, 2018 interview of Charles Lohrs, which was disclosed to the defense, he indicated that Mr. Legnos would often yell.  *See* Exhibit E.  Regarding the second note, it is clear that Mr. Flick is not speaking from personal knowledge, but rather appears to be recalling something he heard, and he is not even sure from whom.  Neither statement is exculpatory.

Last, Sparks references another two statements related to Flick's access to Viewnet and a design made by Carderock, which he claims are exculpatory and should have been disclosed.

    e.  Carderock, not LBI, designed the motor controller for the LDUUV

    f.  Flick saw LBI SolidWorks files on ViewNet

Again, Sparks misrepresents what is written in SA Mehring's notes.  What the notes state regarding Carderock is as follows:

> Rusty Kollmorgen > Don't know
> Kollmorgen Motor controllers – by Carterock

Kollmorgen is a company that makes motor controllers, among other things.  And what Mr. Flick indicated was that he did not know Rusty Kollmorgen (who had no affiliation with the company by the same name), but that Carterock (a Navy laboratory) used Kollmorgen motor controllers. This statement is not relevant, much less exculpatory.

Moreover, the fact that Mr. Flick saw SolidWorks files on Viewnet is also not exculpatory.  That some SolidWorks files might have been uploaded to ViewNet does not negate any essential fact underlying the elements of the offenses charged.  In any event, the information that some SolidWorks files were uploaded to ViewNet was disclosed in discovery through multiple email communications, many of which were marked into evidence at trial by the defense, and all of which were disclosed to the defendant as of December 19, 2016, as part of the Government's first discovery disclosure.  *See* Sample Email Communications attached hereto as Exhibit DD.  This information was also disclosed through the mirror image of Sparks's LBI computer.  In fact, the defendant's computer forensic expert, Mr. Spencer, relied on that image to testify about cache pages on the computer that appeared to show that SolidWorkds files were uploaded to ViewNet.  No evidence was suppressed.

   11. <u>Allegations Regarding Peter Legnos</u>

Sparks surprisingly alleges that the prosecution did not disclose evidence regarding equipment designed and sold by LBI to the Navy for use in dolphin-assisted mine hunting.  But this is precisely the information contained in the "hoursandollars.xls" file (Count 21) stolen by Sparks and found on his personal electronic device by the StoneTurn Group.  The file was produced in discovery on December 19, 2016, as part of the files produced by LBI, which were provided to LBI by the StoneTurn Group.  An examination of the file shows that it contains job costing information related to various contracts held by LBI, including the contract to manufacture the devices used by dolphins to drop charges on mines.  Hence the information was indeed disclosed.  Mr. Legnos simply explained the information contained in the hoursanddollars.xls file to the jury.

As stated earlier, the defendant takes an expansive view of what is considered exculpatory.  In the defendant's view, anything at all he considers to be useful in any way is exculpatory.  But this is not the law.  In this regard, we bring the Court's attention to the defendant's argument prior to trial to the effect that the Government had failed to produce 5,000 documents from the Metron production (which we deny), containing "a wealth of exculpatory information."  The 5,000 documents were again provided in discovery to the defendant. Significantly, not a single document from the Metron production was introduced into evidence at trial by the defense despite its claim that the cache of allegedly missing 5,000 documents contained a wealth of exculpatory information.

Moreover, the case at hand is unlike the circumstances in *United States v. Kiszewski*, 877 F.2d 210 (1989), where the Government informed that the personnel file of an FBI agent contained some potentially impeaching information, but the Court declined to review the information *in camera* to determine if it should be disclosed.  877 F.2d at 215-16.  The Second Circuit held that in a case where the credibility of a witness is a central issue in a case, it was error for the court to refuse to compel production of the file for *in camera* inspection.  *Id*. at 216.

Here, the Government has disclosed appropriate *Brady* and *Giglio* information, and the defendant's motion to compel disclosure of all of the Prosecution Team's handwritten notes is based on nothing more than speculation.  Sparks seeks to examine SA Chris Mehring and SA Stroh, but fails to state what about?  To the extent the Court understands that the Government has failed to produce discoverable information under either *Brady* or *Jencks*, which it denies, respectfully the proper procedure would be for the Court to examine the appropriate report or handwritten notes *in camera* to see if there is anything that should have been disclosed.

No such information exists.  The evidence presented at trial proved beyond a reasonable doubt that the defendant switched his desktop folder to his Dropbox folder; upgraded his Dropbox account; transferred thousands of files belonging to LBI to his personal Dropbox account by dragging files to his desktop (i.e., his Dropbox folder); and then uninstalled the Dropbox application from his LBI computer to cover his tracks.  This evidence was uncontradicted at trial given that the defendant's own computer forensic expert agreed with each conclusion.  Thus, the defendant would be hard pressed to find information that would affect the outcome of the trial.

B.    <u>The Government did not fail to disclose <em>Jencks</em> Information</u>.

Sparks argues that the requested documentation constitutes <em>Jencks</em>.  But a report of an interview of a witness typically is not a "witness statement" – it is usually not substantially verbatim and has never been adopted by the witness.  Similarly, the handwritten notes of the agent do not constitute a "witness statement" either.  While defense counsel insists on treating Agent Mehring's interview reports as witness statements, the fact is that they are not statements of a witness and are not discoverable under the Jencks Act.  While the Government elected to disclose agency reports in this case, such disclosure did not convert agency reports into statements of witnesses.

The Second Circuit has clearly established the circumstances under which agency reports may be subject to disclosure under the Jencks Act.  <em>See CES</em>, 753 F.3d at 93-94; <em>Almonte</em>, 956 F.2d at 29.  Specifically, such reports are not required to be disclosed unless the agent is a prospective witness concerning the substance of the report he or she wrote; the report contains statements by the defendant; the reports contain substantially verbatim statements of a witness;

or the witness has adopted the statement as his own.  None of these conditions are met in this case.

Sparks has made no showing that the requested documentation, including investigative and law enforcement reports and handwritten notes, contain statements used or adopted by any government witness who testified at trial, so as to trigger the Court's obligation to review such documentation *in camera, much less hold a hearing.  See United States v. Henke,* 222 F.3d 633, 642 (9th Cir.2000) (district court's obligation to review privileged pretrial interview notes not "trigger[ed]" where "defendants made no showing that they might discover something exculpatory or impeaching, [n]or did they show that the notes were used or adopted by the witness").  In fact, during trial, every government witness who was asked whether they had reviewed the agent's report regarding their interview responded that they had **not**.

On June 22, 2018, during cross-examination, David Mittelman was specifically asked if he had seen the reports that were generated by the Government from his interview and he responded that he had not.  Trial Transcript, June 22, 2018, pp. 28-29.

> Q.     Have you ever seen the interview reports that were generated from the
>        various times that you were interviewed by government agents?
> A.     I have not.
> Q.     So when they prepared you to testify here yesterday and today, did they
>        give you the opportunity to review the reports that were created
>        when they interviewed you years ago?
> A.     They were discussed, but I did not sit down and read them end to end.

The Government does not have the remaining trial transcripts, but represents that not a single witness testified that they had been shown any interview reports that had been generated as a result of being interviewed by the Government, much less adopted the same.  Therefore, none of the reports generated by the Government constitute *Jencks* information.

Further, the Government has also fully complied with its obligations under *Jencks*.  As established above, any notes that might have been taken during the course of a trial preparation session with a trial witness does not constitute *Jencks* material unless a witness has reviewed and adopted those notes as his/her own statements or the notes constitute a verbatim recitation of the witness's statement.  It is clear in the case at bar that no witness reviewed any notes taken by the Government during any interview, nor were any verbatim recitations produced.  Therefore, the discretionary decision by the Government in this case not to turn over notes of interviews cannot give rise to a presumption, as the defendant argues, that the Government has failed to comply with its *Brady* obligations, particularly when the Government has made *Brady* disclosures during the course of trial.

**Motion for Reconsideration of Order to Continue Cross-Examination of SA Mehring**

A hearing to determine whether the Government has complied with its disclosure obligations is not warranted by the facts of this case.  The Court has scheduled a hearing for the continuation of the "cross-examination" of Special Agent Mehring.  In light of the fact that the trial was completed, a verdict was rendered and the jury was discharged, there is no reason for any further cross-examination of Agent Mehring.  Cross-examination is a tool afforded the opposing party to explore the credibility of a witness during trial.  The defense was afforded the opportunity to cross-examine Agent Mehring at trial before the jury.  The proposed hearing has nothing to do with the credibility of Agent Mehring.

The Court has not established the scope or purpose of the hearing.  The Government submits that the defendant has failed to establish a viable legal justification for this hearing as reflected in this response.  Therefore, any further inquiry of SA Mehring is unwarranted.

<u>Conclusion</u>

It is well-established that a defendant's speculative and conclusory claims that *Brady* information has been withheld by the Government are insufficient to trigger an *in camera* inspection or evidentiary hearing.  *See, e.g.*, *United States v. Navarro*, 737 F.2d 625, 631 (7th Cir. 1984) ("Mere speculation that a government file may contain Brady material is not sufficient to require a remand for in camera inspection … A due process standard which is satisfied by mere speculation would convert Brady into a discovery device and impose an undue burden upon the district court."); *Riley v. Taylor,* 277 F.3d 261, 301 (3d Cir.2001) (citing *Ritchie,* 480 U.S. 39, 58 n.15 (1987); *United States v. Pou*, 953 F.2d 363, 366-67 (8th Cir. 1992) (*quoting Navarro*).

The defendant's speculative claims here do not differ from the claim advanced by the defendants in *United States v. Milikowsky*, 896 F.Supp. 1285 (D.Conn. 1994), where the Court held:

> The defendants have provided no basis upon which this Court can distinguish their desire to peruse the prosecutor's notes from that of all other criminal defendants who believe they would benefit from reading the prosecutor's interpretations and descriptions of interviews with unsworn witnesses.  Were this Court to grant the Defendant's motion, it would set an absurd precedent, allowing defendants to scour the working notes of prosecutors upon the mere accusation that the government has not sufficiently disclosed every potentially exculpatory detail.

*Id*. at 1309, aff'd 65 F.3d 4 (2d Cir. 1995).  *See also United States v. Ferguson*, 2008 WL 104078 (D.Conn. 2008), p. 2 (denying request for *in camera* inspection of handwritten notes based on defendants' claims that "the summaries likely omitted *Jencks* and *Brady/Giglio* material").

Here, Sparks does not set forth a specific *Brady* request, but rather advances a general request for "prosecution team's notes reports, and information" based on the unsubstantiated presumption that non-disclosed government work product must contain *Brady* information.  This

is precisely the type of general inquiry that the Supreme Court has repeatedly stated is not permitted.

Moreover, were the Court to determine that the defendant has raised a valid non-disclosure claim, which we deny, then it falls upon the Court to examine the related documentation *in camera* to determine if any exculpatory information exist in the first instance, and if so, whether such information would have affected the outcome of the case.  As in *Ritchie*, to allow the defendant the unfettered access to Government files that constitute privileged work product would deny the Government's compelling interest in keeping its work product files confidential.

WHEREFORE the United States respectfully requests that the defendant's Motion to Compel Production of Prosecution Team's Notes, Reports and Information Based on *Brady*, Giglio and Discovery Violations be denied.

Respectfully submitted in Bridgeport, Connecticut this 8th day of August, 2018.

JOHN DURHAM
UNITED STATES ATTORNEY

/s/Jacabed Rodriguez-Coss
Jacabed Rodriguez-Coss
Assistant U.S. Attorney
Federal Bar No. phv04471
1000 Lafayette Blvd., 10th Floor
Bridgeport, CT  06604
Tel. (203) 696-3000
Jacabed.rodriguez-coss@usdoj.gov

JOHN P. CRONAN
ACTING ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

/s/ Kebharu Smith
Kebharu Smith
Trial Attorney
Federal Bar. No. phv09299
1301 New York Avenue N.W., 6th Floor
Washington D.C.  20005
(202) 353-0107
kebharu.smith@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

     I HEREBY CERTIFY that on this same date the foregoing motion was filed electronically. Notice of this filing will be sent by e-mail to all parties by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's system.

<u>s/ <i>Jacabed Rodriguez-Coss</i></u>
Jacabed Rodriguez-Coss Assistant
United States Attorney
